UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

ROBERT A. SCHMIDT,

                         Plaintiff,                    **MEMORANDUM & ORDER**
                                                      15-CV-2692 (MKB)

          v.

CAROLYN W. COLVIN
*Acting Commissioner, Social Security*
*Administration*,

                         Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Robert A. Schmidt filed the above-captioned action pursuant to 42 U.S.C.

§ 405(g) seeking review of a final decision of the Commissioner of Social Security (the

"Commissioner") denying his claim for disability insurance benefits.  The Commissioner moves

for judgment on the pleadings, claiming that the decision by Administrative Law Judge James

Kearns (the "ALJ") is supported by substantial evidence and should be affirmed.  (Comm'r Not.

of Mot. for J. on Pleadings, Docket Entry No. 10; Comm'r Mem. in Supp. of Mot. for J. on the

Pleadings ("Comm'r Mem."), Docket Entry No. 11.)  Plaintiff cross-moves for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing principally that

the ALJ (1) failed to properly weigh the medical evidence by not according appropriate weight to

the opinion of Plaintiff's treating psychiatrist, (2) failed to consider Plaintiff's mental

impairments in assessing Plaintiff's residual functional capacity ("RFC"), and (3) improperly

found, without evidentiary support, that Plaintiff could perform any of three sedentary jobs

available in the national economy.  (Pl. Cross-Mot. for J. on Pleadings, Docket Entry No. 13; Pl.

Mem. in Supp. of Cross-Mot. for J. on the Pleadings ("Pl. Mem.") 8–11, Docket Entry No. 13-1.)

For the reasons set forth below, the Court denies the Commissioner's motion for judgment on the pleadings and grants Plaintiff's cross-motion for judgment on the pleadings.

## I. Background

Plaintiff is a fifty-one-year-old man who has completed high school and three years of college. (Certified Admin. Record ("R.") 31–33, Docket Entry No. 7.) Plaintiff last worked in February of 2012 as a manager in the frozen-food department of a Pathmark grocery store. (R. 33.) On May 15, 2012, Plaintiff applied for disability insurance benefits, alleging he was disabled as of February 1, 2012 due to peripheral neuropathy,[1] diabetes, heel spurs, sleep apnea, obesity, a herniated disc, obsessive-compulsive personality disorder ("OCPD"), hearing loss and post-traumatic stress disorder ("PTSD"). (R. 140–43, 166.) Plaintiff's application was denied. (R. 58, 67–78.) Plaintiff requested a hearing before the ALJ, which was held on November 15, 2013. (R. 28–50.) By decision dated March 13, 2014, the ALJ found that Plaintiff was not disabled and denied Plaintiff's application. (R. 11–27.) On April 28, 2015, the Appeals Council denied review of the ALJ's decision. (R. 1–6.)

### a. Plaintiff's testimony

Plaintiff lives in Staten Island with his wife and daughter. (R. 4–5.) According to Plaintiff's testimony at the November 15, 2013 hearing, Plaintiff was disabled because of neuropathy in both legs, which caused burning and tingling sensations down to his feet. (R. 39.) He found it easier to sit than to stand, and he was prescribed Neurontin for the neuropathy. (R. 39.) Plaintiff was being treated for bipolar disorder, and his medication kept him "in a constant fog" preventing him from being able to manage his own appointments and other

---

[1] Peripheral neuropathy is the result of damage to peripheral nerves, typically those in the hands and feet. *See* "Peripheral Neuropathy," Mayo Clinic Online, *available at* http://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy.

medications. (R. 39.) His hearing problems further frustrated him during normal conversation. (R. 39.)

On October 22, 2013, Plaintiff underwent gastric bypass surgery. (R. 395–97.) Before his surgery, he weighed 345 pounds, and at the time of his hearing approximately a month later, he weighed 303 pounds. (R. 4, 43.) At the time of his hearing, Plaintiff could walk for ten to fifteen minutes at a time, but was constantly numb and dizzy when standing. (R. 42.) He could not bend or squat, and he did not do housework except to wash the dishes. (R. 40–41.) After his gastric bypass surgery, Plaintiff was temporarily restricted from lifting but was able to lift again in three months. (R. 42.) Before his surgery, Plaintiff had been able to lift objects weighing up to twenty or thirty pounds. (R. 42.)

Plaintiff was diagnosed with PTSD resulting from three unrelated incidents — an armed robbery, a gunfight and a fire — that occurred between 1997 and 1999 while he was working at Pathmark. (R. 43–46.)

When he filed his claim for disability insurance benefits, Plaintiff listed thirteen medications that he was prescribed by his various doctors. (R. 200.) He indicated that four of the medications impaired his driving ability and caused drowsiness and/or dizziness. (R. 200.)

**b. Plaintiff's work history**

Plaintiff previously owned a fireworks business and was arrested in 2011 for selling fireworks without a license. (R. 35, 41.) Plaintiff last worked at Pathmark as a manager in the frozen food department, where he placed orders, planned displays and wrote schedules. (R. 33.) In February of 2012, Plaintiff was fired from Pathmark when he was criminally charged for the fireworks offense. (R. 33–35, 166.) In his June 6, 2012 disability report to the Social Security Administration, Plaintiff stated that he stopped working on February 18, 2012 because of his

neuropathies. (R. 39.) He further stated in the disability report that he had informed Pathmark that he would be taking disability leave and was undergoing medical testing, and that the company "used the fireworks case as a reason to get rid of [him]." (R. 33.) After pleading to the fireworks charge, Plaintiff served time in a federal prison hospital and correctional facility for ninety days, from February 9 through May 6, 2012. (R. 35, 38.)

### c. Vocational expert's testimony

Michael Smith, a rehabilitation counselor, testified as a vocational expert at Plaintiff's hearing. (R. 47–49; 119–120.) Smith described Plaintiff's job as a department manager as "medium exertional level" work. (R. 47–48.) The ALJ asked Smith to assume a hypothetical individual with Plaintiff's past jobs, who was "limited to the sedentary exertion level" and would "need the option to stand or sit at will, while staying on task." (R. 48.) The ALJ added that the individual "could only do simple and routine tasks." (R. 48.) Smith testified that such a person would be unable to perform any of Plaintiff's past work. (R. 48.) The ALJ asked Smith whether there were jobs in the national economy for the hypothetical individual. (R. 48.) Smith testified that there were jobs available as a food and beverage order clerk, a document preparer, or a "call-out operator." (R. 48.)

When the ALJ asked whether there might be employment if the hypothetical individual had one unscheduled absence per week, Smith responded that there would not be employment under those circumstances. (R. 49.)

### d. Medical evidence

#### i. Dr. James L. Bruno

On January 4, 2006, Plaintiff visited the office of James L. Bruno, M.D., for a consultation regarding possible sleep apnea syndrome. (R. 209–211.) Dr. Bruno noted

Plaintiff's history of asthma as a teenager, hypertension, bronchitis, and prior surgical history for a hernia. (R. 209.) Dr. Bruno ordered a sleep study, prescribed Advair, and counseled Plaintiff on diet and weight loss. (R. 211.) On January 30, 2006, Plaintiff saw Dr. Bruno to undergo a sleep study, which revealed moderate sleep apnea at an incidence of 29.1 events per hour. (R. 217; *see* R. 216–19, 226–29.) Plaintiff was instructed to return for a sleep study with continuous positive airway pressure (CPAP) therapy, undergo aggressive weight loss, and refrain from driving and "other such activities" if he experienced an excessive desire to sleep. (R. 217.) On March 13, 2006, Plaintiff underwent a second sleep study, which showed "complete revers[al of] . . . sleep-disordered breathing" with CPAP therapy. (R. 213, 220–25.)

### ii. Dr. Anthony Olivieri

From March 2 until August 13, 2005, Plaintiff received treatment for a left heel spur from Anthony Olivieri, M.D. (R. 233.) Dr. Olivieri treated Plaintiff's left heel condition on an ongoing basis from March of 2008 until July of 2011. (R. 233.) Plaintiff received surgery for a left foot hammertoe in May of 2009. (R. 233.) In December of 2011, Plaintiff returned to see Dr. Olivieri. (R. 233.) Plaintiff complained of right heel pain and received cortisone injections. (R. 233.) Dr. Olivieri instructed Plaintiff to stay off his feet for two weeks. (R. 233.)

### iii. Dr. Kate Spektor

On June 2, 2011, Plaintiff obtained an audiology report at the office of Kate Spektor, M.D. (R. 291.) The report revealed "profound . . . hearing loss" in Plaintiff's left ear and normal hearing in his right ear. (R. 291.) The report indicated that Plaintiff had suffered head trauma at the age of four and exploratory surgery in the left ear at the age of twelve. (R. 291.) Dr. Spektor recommended that Plaintiff follow up with his primary care physician, consider using a hearing aid, and receive annual audiological evaluations. (R. 291.)

### iv. Dr. Neil N. Nepola

Plaintiff's primary care physician of six years, Neil Nepola, M.D., wrote a letter dated December 27, 2011 and addressed "to whom it may concern," in which he stated that Plaintiff had "struggled with obesity," and had been diagnosed with adult-onset diabetes, hypertension, peripheral neuropathy secondary to the diabetes, back pain with a herniated disk, foot pain, and joint pain likely due to obesity and degenerative arthritis. (R. 235.) Plaintiff was a candidate for gastric bypass surgery. (R. 235.) Dr. Nepola also wrote that Plaintiff could not work until reevaluation for peripheral neuropathy. (R. 236.)

Dr. Nepola wrote a second letter, dated February 3, 2012 and addressed "to whom it may concern," stating that Plaintiff's diabetes was difficult to control and that Plaintiff had developed end organ damage, resulting in blurred vision. (R. 234.) Dr. Nepola noted that Plaintiff was experiencing peripheral neuropathy, making it difficult for him to move, sit and stand for long periods of time. (R. 234.) Plaintiff also experienced urinary frequency secondary to diabetes and chronic lower back pain, contributing to the neuropathy and creating a gait disturbance. (R. 234.) Dr. Nepola noted that although Plaintiff was following a "strict diet protocol," he remained morbidly obese and was a candidate for gastric bypass surgery. (R. 234.) Dr. Nepola added that Plaintiff had a "multisystem disease" and that he should be closely supervised. (R. 234.)

On January 28, 2013, Dr. Nepola wrote Plaintiff a note that indicated Plaintiff could not work due to peripheral neuropathy in both legs. (R. 293.) On February 5, 2013, Dr. Nepola wrote a letter medically clearing Plaintiff for bariatric surgery and noting that Plaintiff had been following a low-calorie diet and exercise program since August 20, 2012. (R. 294.)

###### v. Dr. Robert R. Welch

On May 7, 2012, Robert Welch, M.D., provided an opinion, addressed "to whom it may concern," as to Plaintiff's employability, corroborating the opinion of Dr. Nepola.[2] (R. 253.) In the letter, Dr. Welch stated that Plaintiff's medical conditions would affect his ability to work as a frozen food manager for Pathmark, which job included standing and walking for almost an eight-and-one-half hour work day, squatting, stooping, bending, lifting large heavy boxes, pushing, pulling and twisting. (R. 252.) Dr. Welch noted that Plaintiff had chronic back pain from degenerative joint disease of the lumbar spine, peripheral neuropathy affecting bilateral lower extremities, sciatica of bilateral lower extremities, chronic bilateral foot pain despite multiple corrective surgeries and bilateral heel spurs from chronic plantar fasciitis. (R. 252.) Dr. Welch stated that Plaintiff's medication was not effective at relieving the symptoms, that Plaintiff's employment would exacerbate his pain and put him at risk for further injury, and that Plaintiff's medical issues were "chronic and permanent in nature." (R. 252.) Dr. Welch also noted that Plaintiff met the criteria for a diagnosis of PTSD. (R. 252.) He concluded that Plaintiff is "unable to work indefinitely," and that "all indications suggest he is permanently disabled." (R. 252.)

In a second letter dated the same day and also addressed "to whom it may concern," Dr. Welch wrote that Plaintiff's conditions included diabetes mellitus, peripheral neuropathy of both legs, degenerative joint disease of the lumbar spine, chronic back pain, sciatica, morbid obesity, chronic obstructive pulmonary disease (COPD), sleep apnea, chronic plantar fasciitis of both feet with resultant bilateral heel spurs and chronic foot pain, perennial allergic rhinitis, asthma, hypertension, erectile dysfunction, high cholesterol, benign prostatic hypertrophy and a

---

[2] The record is unclear as to whether and for how long Dr. Welch treated Plaintiff.

presumptive diagnosis of PTSD. (R. 254.) Dr. Welch opined that some of Plaintiff's medical concerns were well controlled but many were not. (R. 254.) Dr. Welch further stated that Plaintiff "will always have chronic pain in his back, legs and feet," and that "[t]he peripheral neuropathy and degenerative joint disease of his back will gradually worsen over time and not improve." (R. 254.) He recommended classifying Plaintiff as permanently disabled. (R. 254.)

### vi. Dr. Robert Conciatori

On July 2, 2012, Plaintiff visited the office of Robert Conciatori, M.D., a psychiatrist. (R. 442–43.) Plaintiff indicated that he was depressed, anxious, sleeping poorly and having panic attacks. (R. 442.) Plaintiff also reported that while he was in prison, a psychiatrist who was also an inmate told him that he had PTSD. (*Id.*) Upon examination, Dr. Conciatori found that Plaintiff was depressed and anxious, but that his memory and concentration were intact and that he was stable and compliant. (R. 442–43.) Dr. Conciatori diagnosed Plaintiff with bipolar disorder, prescribed Seroquel XR and Viagra and recommended that Plaintiff continue psychotherapy. (R. 443.) Plaintiff returned to Dr. Conciatori on August 13 and September 10, 2012 and reported that the Seroquel XR was "working for him and calming him down." (R. 444–45.) Dr. Conciatori wrote that Plaintiff was no longer easily provoked into arguments with his wife and was no longer tired and fatigued. (R. 444.) On both dates, Plaintiff discussed the status of his fireworks business and his frustration with his wife's management of the business. (R. 444.) Dr. Conciatori noted no side effects from the medication and noted that Plaintiff would be undergoing gastric bypass surgery in three months' time. (R. 444.)

On October 8, 2012, Plaintiff returned to Dr. Conciatori complaining of further arguments with his wife relating to the business as well as diabetes, neuropathy, and COPD. (R. 446.) Dr. Conciatori's examination found no change to Plaintiff's mental diagnoses,

including that he suffered from bipolar disorder. (R. 447.) On November 5, 2012, Plaintiff visited Dr. Conciatori, expressing that he was upset over the loss of electrical power from a hurricane. (R. 448.) Dr. Conciatori's diagnosis remained unchanged. (R. 448–49.) On December 3, 2012, Plaintiff complained to Dr. Conciatori about his arguments with his wife but also noted that he felt more liberated and in control because he was no longer under house arrest. (R. 450.) Plaintiff's course of treatment remained the same. (R. 451.) At another meeting on December 31, 2012, Plaintiff reported that he was not feeling depressed or manic that day, and that his relationship with his wife had improved that month. (R. 452.)

On February 4, 2013, Plaintiff returned to see Dr. Conciatori. (R. 454.) He discussed financial issues from the dissolution of his fireworks business and the strain of those issues on his marriage. (R. 454.) Plaintiff also stated that he had not experienced manic symptoms since beginning treatment with Seroquel XR. (R. 454.) He noted that his medication was helping him, and that he had "more good days than bad days." (R. 454.) Dr. Conciatori's findings and course of treatment remained unchanged, but he noted that because Plaintiff could not stand on his feet for over ten minutes without experiencing leg pain and numbness, Plaintiff could not work. (R. 454.)

On March 4 and April 1, 2013, Plaintiff spoke to Dr. Conciatori about his problems with his wife and the residual problems from his business. (R. 457.) Dr. Conciatori wrote that Plaintiff was "very tense," but continued to assess him as stable, with no side effects from the same sequence of medication. (R. 457.)

During his visits to Dr. Conciatori on May 7, June 3, July 31, September 3 and October 1, 2013, Plaintiff remained stable and continued to discuss frustrations with his financial situation, his wife, his business, and former business partner. (R. 458–67.) He was involved in business

litigation and fighting with his wife, all of which had caused him to experience "extreme anxiety." (R. 460, 462.) On June 3, 2013, Plaintiff reported he took Seroquel XR occasionally, as needed. (R. 460.) Dr. Conciatori's findings remained unchanged during these visits. (R. 458–67.)

In a letter dated October 1, 2013 and addressed "to whom it may concern," Dr. Conciatori wrote that Plaintiff was "very symptomatic" and prone to "severe depression and anxiety periods." (R. 374.) Dr. Conciatori also wrote that Plaintiff's bipolar disorder was "not only 100% disabling but also permanent and not likely to change even with further treatment." (R. 374.) Dr. Conciatori reported that Plaintiff was incapacitated by his mood symptoms and was psychiatrically unfit to return to any type of work. (R. 374.) He noted that "[t]reatment efforts continue to try to stabilize [Plaintiff] and prevent either hospitalization or attempts at [self-harm]." (R. 374.)

On November 12, 2013, Plaintiff reported to Dr. Conciatori that he had lost forty-three pounds since undergoing gastric bypass surgery approximately one month earlier. (R. 468.) Dr. Conciatori's notes reflect no change to the diagnosis or to Plaintiff's mental state. (R. 468.)

On June 10, 2014, Dr. Conciatori completed a "Medical Source Statement of Ability to Do Work-Related Activities."[3] (R. 55–56.) Checking boxes as required by the form, Dr. Conciatori indicated that Plaintiff had "slight" restrictions in understanding and carrying out short, simple instructions; that Plaintiff had "moderate" restrictions in understanding and carrying out detailed instructions; and that Plaintiff had "extreme" restrictions in the ability to make judgments on simple work-related decisions. (R. 55.) Dr. Conciatori wrote that Plaintiff was bipolar and "very manic," and that he would fight with co-workers and rebel against

---

[3] This information was presented only to the Appeals Council. (*See* Comm'r Mem. 17.)

authority. (R. 55.) He assessed marked limitations in Plaintiff's ability to interact appropriately with the public and with co-workers and to respond to changes in a routine work setting. (R. 56.) Dr. Conciatori also found "extreme" limitations in Plaintiff's ability to interact appropriately with supervisors and respond appropriately to work pressures. (R. 56.) Dr. Conciatori further noted that Plaintiff's bipolar disorder affected Plaintiff's ability to concentrate. (R. 56.)

### vii.  Dr. Mario Alicandri

On February 25, 2013, Plaintiff was examined by Mario Alicandri, M.D. (R. 336–43.) Dr. Alicandri noted that Plaintiff was obese and that Plaintiff described his obesity as "chronic." (R. 338.) Dr. Alicandri identified that Plaintiff was suffering from back pain and an abdominal hernia. (R. 338.) Plaintiff's gait was normal, his reflexes were intact, he was fully oriented, and his mood and affect were normal. (R. 340.) Dr. Alicandri diagnosed Plaintiff with diabetes mellitus, hypertension, hyperglyceridemia and high cholesterol. (R. 340.) He noted that Plaintiff also suffered from asthma, depression, hearing loss, high blood pressure, mental illness, bipolar disorder, obesity and sleep apnea. (R. 342.) Dr. Alicandri continued Plaintiff's medications. (R. 340.)

On March 29, 2013, Plaintiff returned to Dr. Alicandri, complaining of "acute malaise" for the past two days. (R. 331.) Dr. Alicandri wrote that Plaintiff's symptoms had not limited his activities and that "the frequency of the episodes [wa]s decreasing." (R. 331.) Dr. Alicandri ordered a foot and eye exam. (R. 333.)

Plaintiff visited Dr. Alicandri again on April 26, 2013, complaining of mild, sharp back pain for the past six days after doing "heavy lifting cleaning [his] garage." (R. 324.) Dr. Alicandri found that Plaintiff's pain was not limiting his activities, and he noted that Plaintiff denied numbness or weakness in his extremities. (R. 324.) Dr. Alicandri diagnosed Plaintiff

with back pain syndrome and prescribed diclofenac sodium.  (R. 326.)  He told Plaintiff to return

in three months if his symptoms persisted.  (R. 326.)  On June 30, 2013, Plaintiff returned for his

follow-up appointment.  (R. 315–321.)  Dr. Alicandri diagnosed Plaintiff with hypertension,

obesity and controlled type II diabetes mellitus, and advised him to return in three months and, in

the interim, to follow a low-fat diet.  (R. 319.)

### viii.  Dr. Tanya Powerman

On April 19, 2013, Plaintiff visited Tanya Powerman, M.D., a podiatrist.  (R. 379–80; *see*

*also* R. 376, 379–88.)  Dr. Powerman's examination revealed that Plaintiff had difficulty feeling

sensation in his feet.  (R. 379.)  Plaintiff's x-rays reflected mid-foot degenerative joint disease,

hammertoes and severe plantar spurs.  (R. 379–80.)  Plaintiff returned to see Dr. Powerman on

July 12 and September 20, 2013.  (R. 379.)

### ix.  Dr. Fritz A. Galette, consultative psychological examiner

On August 31, 2012, Plaintiff attended a psychiatric exam conducted by Fritz Galette,

Ph.D., a psychologist, at the Commissioner's request.  (R. 256–57.)  Plaintiff drove to the

examination unaccompanied, and Dr. Galette's report notes that Plaintiff "is able to travel

alone." (R. 256.)  Dr. Galette noted that Plaintiff had a history of PTSD secondary to traumatic

exposure to violent events and that he had a medical history of diabetes, asthma, sleep apnea,

neuropathy and arthritis, and a psychological history of bipolar disorder and cycling between

manic and depressive episodes.  (R. 256.)  On examination, Plaintiff's mood, affect and motor

behavior were agitated, and his thought process was tangential.  (R. 256.)  Dr. Galette also noted

that Plaintiff's appearance was normal, his manner of responding was cooperative, his facial

expressions were appropriate, his eye contact was good, and he was alert and fully oriented.

(R. 256–57.)  Dr. Galette also wrote that Plaintiff's memory and concentration were intact, and

that he observed no abnormalities with Plaintiff's speech, language, or his insight and judgment. (R. 257.)  In his summary, Dr. Galette noted that Plaintiff's "current mental status is manic." (R. 257.)  Dr. Galette diagnostic impression was to "r/o," or rule out,[4] bipolar disorder.  (R. 257.)

### x.  Dr. Lamberto Flores, consultative physical examiner

On September 4, 2012, Dr. Lamberto Flores, M.D., examined Plaintiff at the Commissioner's request.  (R. 258–62.)  Plaintiff reported a history of insulin-dependent diabetes mellitus with neuropathy, lumbar herniated disk with arthritis, hearing loss, bipolar disorder with PTSD, right knee meniscal tear and sleep apnea.  (R. 258.)  Plaintiff stated that he would become short of breath from walking more than ten to fifteen minutes with leg discomfort and back pain. (R. 259.)  Dr. Flores noted that Plaintiff had no symptoms or pain with prolonged sitting or standing for fifteen to twenty minutes.  (R. 259.)  Plaintiff could slowly climb up to two or three flights of stairs with back pain, and he could not lift more than thirty to forty pounds.  (R. 259.) Dr. Flores found that Plaintiff had a limited range of motion of his cervical spine and limited straight leg raising due to cervical disk disease.  (R. 261.)  Dr. Flores otherwise found that Plaintiff's motor and sensory system were within normal limits, that his gait was normal, that he did not need a cane, that he could do "tandem, toe, and heel walking," and that he could squat halfway.  (R. 261.)  Dr. Flores assessed that Plaintiff could squat halfway and bend from 0 to 70

---

[4] "Rule-out" references a provisional diagnosis to be ruled out with further medical investigation.  *See Straughter v. Comm'r of Soc. Sec.*, No. 12-CV-825, 2015 WL 6115648, at *16 n.38 (S.D.N.Y. Oct. 16, 2015) (explaining that psychiatric diagnoses were "rule-out or hypothetical diagnosis needing further exploration"); *Beach v. Comm'r of Soc. Sec.*, No. 11-CV-2089, 2012 WL 3135621, at *8 (S.D.N.Y. Aug. 2, 2012) ("In the medical context, a 'rule-out' diagnosis means there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out." (quoting *Carrasco v. Astrue*, No. 10-CV-43, 2011 WL 499346, at *4 (C.D. Cal. Feb. 8, 2011)); *Kilkenny v. Astrue*, No. 05-CV-6507, 2009 WL 1321692, at *7 (S.D.N.Y. May 12, 2009) ("Dr. Li used the abbreviation . . . for 'rule out.' Thus, it appears that Dr. Li noted . . . that a possible PTSD diagnosis — post-traumatic stress disorder — was to be revisited and ruled out at a later point in time.").

degrees. (R. 261.) Based on Plaintiff's history and the examination, Dr. Flores concluded that Plaintiff was limited in prolonged walking, standing, climbing stairs, fully squatting, bending and heavy lifting. (R. 262.) Dr. Flores recommended orthopedic and psychiatric evaluations. (R. 262.)

### xi. Dr. W. Skranovski, state agency consultative psychiatric examiner

On October 26, 2012, Dr. W. Skranovski, a State agency psychiatric consultant, reviewed the medical evidence of record and completed a psychiatric review technique form. (R. 264–277.) Dr. Skranovski concluded that Plaintiff had an anxiety-related disorder that was not severe. (R. 264, 269.) Dr. Skranovski found that Plaintiff had no limitations in activities of daily living, maintaining social functioning or maintaining concentration, persistence or pace. (R. 274.) In addition, he found that Plaintiff had not experienced any extended episodes of deterioration. (R. 274.) Dr. Skranovski determined that Plaintiff's concentration, memory and social and cognitive skills were intact, and further indicated that the objective data relating to Plaintiff's PTSD "show[ed] no related functional limitations." (R. 276.)

### e. Additional evidence

While incarcerated, Plaintiff was evaluated for various medical ailments and provided additional information regarding his health history. A March 19, 2012 report from Central Detention Facility indicated that Plaintiff had diabetes mellitus type II, blurred vision, mild and intermittent asthma, hyperlipidemia, sleep apnea, obesity and diabetic peripheral neuropathy. (R. 424.)

On March 22, 2012, Plaintiff completed a "Health Intake Assessment/History." (R. 419.) Plaintiff reported his illnesses as diabetes, asthma, neuropathy and sleep apnea, and reported that

he currently felt pain in his legs. (R. 419–20.) Plaintiff also reported that he had never had a mental illness and that he required a diabetic diet. (R. 419–20.)

Plaintiff also completed a "Psychology Services Inmate Questionnaire," in which he denied ever having received treatment or having taken medication for a nervous or mental problem and denied suicidal ideation. (R. 427.) Plaintiff also denied ever having received a serious head injury. (R. 427.) Plaintiff reported that in the prior two weeks, he had experienced anxiety and relationship problems but indicated that he did not want psychological services at that time. (R. 428.)

At the Rivers Correctional Institution, Plaintiff was placed on a "diet for health" of particular macronutrient intake. (R. 408.) Plaintiff also signed a consent form to permit the staff to administer mood stabilizing medication as needed. (R. 409.) An intake doctor examined Plaintiff on April 2, 2012, and identified an abnormal vascular system, an enlarged prostate, an abnormal foot exam due to diabetes and an abnormal neurological exam. (R. 417.) Plaintiff was diagnosed with diabetes mellitus, asthma, neuropathy, abnormal lipids and allergies. (R. 418.) Although on March 22, 2012, Plaintiff was restricted from working in food service while in custody, (R. 432), on April 2, 2012, he was cleared to work in the kitchen and barber shop, (R. 433). Also on April 2, 2012, Plaintiff signed a "Refusal for Medical Services" form, declining the "diet for health" and diabetic snack offered by the Rivers Correctional Institution. (R. 434.)

On October 22, 2013, Plaintiff underwent gastric bypass surgery. (R. 395–97.) In connection with his clearance for the bypass surgery, Plaintiff obtained an electrocardiogram ("EKG"), an ultrasound, and an endocrine examination. (R. 362, 372, 390.) Plaintiff's EKG was normal, and his ultrasound revealed an enlarged liver "consistent with nonspecific hepatic

parenchymal disease, including but not limited to a fatty liver." (R. 372.) The endocrinologist who cleared Plaintiff for bypass surgery noted that Plaintiff was obese and had a hernia, and counseled Plaintiff on diet and weight loss. (R. 390–93.)

### f. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act (the "SSA"). First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 1, 2012, the onset date of Plaintiff's disability. (R. 16.) Second, the ALJ found that Plaintiff had the following severe impairments: neuropathy, diabetes, obesity and status post gastric bypass. (R. 16.) He also found that Plaintiff had the following non-severe impairments: a bipolar disorder, an unspecified back disorder and sleep apnea. (R. 16–17.)

In making his determination that Plaintiff's bipolar disorder "has not had greater than a slight or minimal effect on [Plaintiff's] ability to perform basic work activities," the ALJ noted that he took into consideration "almost two years of normal mental status examinations, doctor opinions consistently assessing [Plaintiff] as mentally stable since July 2012, [and Plaintiff's] statements that his Seroquel is 100% working and reports saying that he has never been psychiatrically hospitalized . . . ." (R. 18.) The ALJ noted that Plaintiff began treatment for his mental health after he was arrested and fired from his long-time job, "and not due to any longstanding history of a bipolar disorder." (R. 17.) Further, the ALJ noted that Plaintiff's mental status examinations had been consistently normal and that the treatment notes pertaining to Plaintiff's psychotherapy sessions reflected that Plaintiff complained of "psychosocial stressors including his relationship with his wife, his business and financial problems." (R. 17.) The ALJ then summarized Plaintiff's mental health records, as reflected in his psychiatric intake

evaluation, Dr. Conciatori's notes and opinion, Dr. Galette's notes and Dr. Skranovski's notes. (R. 17–18.) The ALJ found that Plaintiff's testimony that he has PTSD "is not credible because he stated in the record that a fellow prison inmate gave him that diagnosis." (R. 17.) He gave "little weight" to Dr. Conciatori's October 1, 2013 opinion that Plaintiff's bipolar disorder was 100% disabling and unlikely to change with further treatment "because it is not supported by [Dr. Conciatori's] own treatment records showing that [Plaintiff] reported responding well to medication, had repeatedly normal mental status examinations and he consistently assessed [Plaintiff] as mentally stable." (R. 18.)

Third, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets, or is equal to, the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 18.) The ALJ considered Listings 9.00(B)(5), pertaining to diabetes mellitus and found that none of Plaintiff's diabetes-related diseases "meet the criteria of any other body system." (R. 18.) The ALJ explained that, for instance, although Plaintiff was diagnosed with diabetic neuropathy, he did not meet the peripheral neuropathy listing because he had not exhibited "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gain and station." (R. 18.) The ALJ also noted that although there are no Listing criteria in Appendix 1 of the Social Security Regulations specific to the evaluation of obesity impairments, he considered Plaintiff's obesity in determining whether Plaintiff's impairments met or equaled any listing section. (R. 18.)

Next, the ALJ determined that Plaintiff can perform sedentary work, except that he needs "the option to sit or stand at will while remaining on task and he is limited [to] simple and routine tasks." (R. 19.) The ALJ based this determination on the medical examinations and notes of Dr. Nepola, Dr. Flores and Dr. Alicandri, which together "show that [Plaintiff's]

diabetes can be controlled and save for a diagnosis of related neuropathy, he has experienced no other diabetic complications." (R. 20.) "Importantly," the ALJ wrote, Plaintiff's "medical records show that the [bariatric] surgery worked, since Dr. Conciatori noted on November 12, 2013 that the claimant had lost 43 pounds since the surgery." (R. 20.)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms, but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."[5] (R. 20.) The ALJ found that although Plaintiff testified that he was unable to work because of his neuropathy, his motor examinations were essentially normal, his extremities were always tested as normal, and he was never described as having an abnormal gait. (R. 20.) The ALJ noted that Plaintiff's medical records indicated that his diabetes could be controlled with medication, that the gastric bypass surgery appeared to be alleviating the obesity that caused his pain, and that Plaintiff's last job did not end for an impairment-related reason but rather because of a felony conviction. (R. 20–21.)

Finally, the ALJ determined that Plaintiff was not capable of performing his past relevant work as a Department Manager because it was too physically demanding in view of Plaintiff's RFC. (R. 22.) The ALJ concluded that, given Plaintiff's age, education and work experience, jobs in the national economy that Plaintiff can perform existed in significant numbers. (R. 23.) The ALJ determined that the vocational expert's testimony that a hypothetical individual with an RFC matching that of Plaintiff could work as a food and beverage order clerk, a document preparer or a call out operator is consistent with the information in the Dictionary of

---

[5] Plaintiff does not appear to challenge the ALJ's determinations as to Plaintiff's physical impairments. (*See generally* Pl. Mem. 8–11.)

Occupational Titles. (R. 23.) Therefore, the ALJ determined that since February 1, 2012, the date of onset for Plaintiff's asserted disability, he has not been suffering from a "disability" as this term is defined under the SSA. (R. 23.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*,

3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

"In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

###### b. Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Social Security Act. To be eligible for disability benefits under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant

is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520").

### c. Analysis

The Commissioner moves for judgment on the pleadings, arguing that (1) substantial evidence supported the ALJ's determination, (2) the ALJ appropriately discounted certain opinions as inconsistent with and unsupported by the medical record, and (3) the ALJ properly found that Plaintiff's mental health impairments were not severe. (Comm'r Mem. 20–23.) Plaintiff cross-moves for judgment on the pleadings, arguing that that ALJ improperly determined that Plaintiff's mental health impairments were not severe by failing to accord the opinion of Plaintiff's treating psychiatrist, Dr. Conciatori, appropriate weight.[6] Plaintiff argues that, as a result, the ALJ improperly found that Plaintiff could work in at least three sedentary

---

[6] Plaintiff also argues that the ALJ erred in stating that Dr. Galette, the Commissioner's consultative psychiatrist, found that Plaintiff's "mental status examination was absolutely normal." (Pl. Mem. 9–10 (citing R. 17).) While Plaintiff is correct that Dr. Galette's report provided additional nuance suggesting that Plaintiff's mental state was not "absolutely normal," the Court finds that the ALJ's characterization of Dr. Galette's examination is harmless error because the ALJ addressed Dr. Galette's examination summarily and did not assign it any weight among several other examinations. *See McKinstry v. Astrue*, No. 10-CV-319, 2012 WL 619112, at *4 (D. Vt. Feb. 23, 2012) ("Failure to address evidence is harmless error if consideration of the evidence would not have changed the ALJ's ultimate conclusion."), *aff'd*, No. 12-CV-1702, 2013 WL 535801 (2d Cir. Feb. 14, 2013); *see also Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (holding that it was harmless error where there was "no reasonable likelihood that [the ALJ's] consideration of the same doctor's 2002 report would have changed the ALJ's determination that [the plaintiff] was not disabled during the closed period").

jobs, all of which Plaintiff contends expose him to public interaction and do not afford him the sit/stand option that the ALJ determined he would need.  (Pl. Mem. 8–11.)

### i. The ALJ appropriately considered the opinion of Plaintiff's treating psychiatrist in finding Plaintiff's mental impairments to be non-severe

Plaintiff argues that the ALJ erred in according little weight to the opinion of Plaintiff's treating psychiatrist, Dr. Conciatori, who wrote in a letter dated October 1, 2013, that Plaintiff's bipolar disorder was "not only 100% disabling but also permanent" and that Plaintiff was incapacitated by his mood symptoms and psychiatrically unfit to return to any type of work, (R. 374).  (Pl. Mem. 8, 9.)  The Commissioner argues that the ALJ properly discounted the opinion of Dr. Conciatori because Dr. Conciatori's conclusion that Plaintiff was "permanently and totally disabled from a psychiatric perspective," (R. 252), was inconsistent with the "substantially normal clinical findings in the record and treatment notes during the relevant time period," (Comm'r Mem. 23).

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative."  *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same).  But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[7]  20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x

---

[7]  A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]."  20 C.F.R. § 404.1502; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

An ALJ must consider a number of factors to determine how much weight to assign to a treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

Here, the ALJ adequately explained his reasons for according "little weight" to Dr. Conciatori's October 1, 2013 opinion. (R. 18.) The ALJ explained that Dr. Conciatori's opinion was not supported by his own treatment records, which show that Plaintiff reported responding well to his medication, had repeatedly normal mental status examinations, and was consistently assessed as mentally stable. (R. 18.) The ALJ correctly noted that Plaintiff reported positive results after Dr. Conciatori prescribed Seroquel, and that Dr. Conciatori repeatedly found Plaintiff to present as mentally stable and occasionally as neither depressed nor manic.[8] (R. 17.) Dr. Conciatori's October 1, 2013 letter did not opine as to Plaintiff's capacities or provide any support for the doctor's opinion that Plaintiff's bipolar disorder was "100% disabling and permanent," and that Plaintiff was "not psychiatrically fit to return to any type of work at this time." (R. 374.) As such, his opinion of complete disability "cannot itself be determinative," *Micheli*, 501 F. App'x at 28, and in any event is reserved for the Commissioner, 20 C.F.R. § 404.1527.

Moreover, Dr. Conciatori's conclusions appear to be inconsistent with the clinical findings and other record evidence. The ALJ summarized Plaintiff's mental health treatment during the relevant time period and found that Plaintiff himself reported no suicidal ideations and was repeatedly diagnosed as mentally stable and compliant by every doctor who examined him. (R. 17–18.) Thus, "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not

---

[8] Although Plaintiff argues that the ALJ "failed to take note of other entries" such as "subjective complaints of depression, panic, poor sleep, [and] fear," those entries were marked on Plaintiff's initial intake form and appear not to have been updated since his initial intake. (*See* R. 464 (noting in the intake notes that Plaintiff "wears a bracelet . . . under house arrest" but noting under "interim history" that Plaintiff "does not have ankle bracelet any longer").) More importantly, the ALJ addressed Plaintiff's reports of his psychological symptoms in considering whether Plaintiff's mental impairment was severe or non-severe. (R. 17.)

afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record." *Halloran*, 362 F.3d at 32. In view of these inconsistencies, the ALJ appropriately accorded little weight to Dr. Conciatori's October 1, 2013 opinion.

### ii. The ALJ improperly determined Plaintiff's residual functional capacity

Plaintiff argues that as a result of the ALJ's "refusal to acknowledge the presence of [Plaintiff's] significant mental disease" in his decision, the ALJ's hypothetical to the vocational expert did not consider Plaintiff's mental impairments. (Pl. Mem. 11.) Based on the substance of Plaintiff's memorandum, the Court understands Plaintiff to argue that at stage four of the sequential analysis, the ALJ did not consider Plaintiff's mental impairments in determining Plaintiff's RFC, which in turn formed the basis for the ALJ's hypothetical to the vocational expert.

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545. With respect to a claimant's physical abilities, an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis. *Id*. § 404.1545(b). For example, "a limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*. In determining the RFC, "the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [the p]laintiff's subjective evidence of symptoms." *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 312 (W.D.N.Y. 2013) (alteration in original) (quoting *Stanton v.*

*Astrue*, No. 07-CV-0803, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §

404.1545(b–e))). "Because an RFC determination is a medical determination, an ALJ who

makes an RFC determination in the absence of supporting expert medical opinion has improperly

substituted his own opinion for that of a physician, and has committed legal error." *Hilsdorf v.

Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (first citing *Woodford v. Apfel*,

93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); and then citing *Zorilla v. Chater*, 915 F. Supp. 662,

666–67 (S.D.N.Y. 1996)).

An RFC determination must also "account for limitations imposed by both severe and

nonsevere impairments." *Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (holding

that even if substantial evidence had supported the ALJ's decision that the plaintiff's mental

impairment was non-severe, "it would still be necessary to remand this case for further

consideration because the ALJ failed to account for [the plaintiff's] mental limitations when

determining her RFC"); *see also* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your

medically determinable impairments of which we are aware, including your medically

determinable impairments that are not 'severe []' . . . when we assess your [RFC] . . . ."); 20

C.F.R. § 416.945(a)(2) (same, but with respect to Supplemental Security Income as opposed to

Social Security Disability Insurance). Where an ALJ "fails to account for any functional

limitations associated with the [non-severe] impairments in determining the claimant's RFC, a

court must remand for further administrative proceedings." *Paz v. Comm'r of Soc. Sec.*,

No. 14-CV-6885, 2016 WL 1306534, at *14 (E.D.N.Y. Mar. 31, 2016) (citing *Parker-Grose*,

462 F. App'x at 18); *see also Jackson v. Colvin*, No. 14-CV-55, 2016 WL 1578748, at *4

(W.D.N.Y. Apr. 20, 2016) ("[T]he ALJ failed to properly consider [the] plaintiff's mental

impairments, whether severe or non-severe, throughout the entire five-step sequential evaluation.

As a result, the ALJ's RFC finding was not supported by substantial evidence." (citation omitted)) *Rookey v. Comm'r of Soc. Sec.*, No. 14-CV-914, 2015 WL 5709216, at *4 (N.D.N.Y. Sept. 29, 2015) (reversing and remanding where the ALJ "fail[ed] to consider [the plaintiff's] non-severe mental impairments in determining his RFC"); *Johnson v. Colvin*, No. 12-CV-1273, 2013 WL 6145804, at *5 (N.D.N.Y. Nov. 21, 2013) (remanding because "failure to consider [the plaintiff's] mental impairments and abilities in assessing her RFC is legal error").

Here, the ALJ failed to consider Plaintiff's non-severe mental impairments in assessing Plaintiff's RFC. Having determined, at step two of the analysis, that Plaintiff's bipolar disorder, anxiety and depression were non-severe, (R. 17–18), the ALJ summarily concluded at step four that "[Plaintiff's] records show that his medication successfully controls his non-severe mental impairments," (R. 21). The sole other mention of Plaintiff's mental impairments at step four is in connection with the opinion of Dr. Welch, which opinion the ALJ dismisses "because many of [Plaintiff's] diseases have stemmed from his obesity . . . and his records show that his mental impairments are not debilitating." (R. 21.) The ALJ appears to have reached the conclusion that Plaintiff's mental impairments were under control by having deemed Plaintiff's mental impairments non-severe, without considering that non-severe impairments may nonetheless limit Plaintiff's RFC.

For instance, although the ALJ appropriately gives "little weight" to Dr. Welch's opinion that Plaintiff was permanently disabled, he did not consider Dr. Welch's specific conclusion that Plaintiff meets the criteria for a PTSD diagnosis. (R. 252.) Similarly, although in step two the ALJ appropriately discounted Dr. Conciatori's October 1, 2013 conclusion as to Plaintiff's complete disability, he failed to consider that after over a year of psychiatric treatment, Plaintiff regularly reported to Dr. Conciatori symptoms of anxiety, depression, and panic attacks that were

only occasionally alleviated by his medication. (R. 442.) Plaintiff also reported "acute malaise" to Dr. Alicandri, (R. 331), and Dr. Galette found Plaintiff agitated and considered his mental status to be "manic," (R. 257). Indeed, Dr. Skranovski, whose opinion the ALJ gave "great weight" in step two, (R. 18), concluded that Plaintiff had an anxiety-related disorder, (R. 264, 269). Because the ALJ failed to account for the limitations imposed by Plaintiff's non-severe mental impairments, the Court remands for consideration of those limitations in determining Plaintiff's RFC. *See Parker-Grose*, 462 F. App'x at 18.

### iii. The ALJ's assessment of the occupations Plaintiff can hold in the national economy

Plaintiff argues that the ALJ erred in relying on the vocational expert's testimony to find that Plaintiff can perform any of three sedentary jobs in the national economy. (Pl. Mem. 11.) Plaintiff argues that, to the contrary, "[t]he record is devoid of evidence" to suggest "that those [three] jobs allow a sit/stand option," as required by the ALJ's RFC determination. (*Id.*) The Commissioner argues that the ALJ properly relied on the testimony of the vocational expert and, in compliance with the Social Security Regulations, confirmed that the expert's testimony was consistent with the Directory of Occupational Titles. (Comm'r Mem. 27.) Because the Court remands the case for further consideration of the Plaintiff's RFC, the Court will not address Plaintiff's remaining arguments, as the ALJ's error in step four impacts the Court's ability to review the ALJ's determination in step five.

**III. Conclusion**

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: August 19, 2016
      Brooklyn, New York